## Richardson v. Richardson et al.

March 1, 1949.

John E. Richardson and Paul Carter for appellant.

Wilson & Wilson and George J. Ellis, Jr. for appellees.

OPINION OF THE COURT BY JUDGE KNIGHT—Affirming.

Appellee brought this suit for absolute divorce against appellant on the ground of six months' cruel treatment. She asked for custody of their two children, Henrietta age eight years, and Billy age twelve years, two hundred dollars per month for support and maintenance of herself and two children, and lump sum alimony of $10,000 together with costs and a reasonable fee for her attorneys.

Appellant counterclaimed asking absolute divorce against appellee on the ground of six months' cruel treat-

ment, and for the custody of their two children. Later by amended answer and counterclaim he alleged that appellee had been guilty of such lewd and lascivious behavior as to prove her to be unchaste and he asked for divorce on this additional ground and for exclusive custody of their two children.

Upon the trial of the case and after consideration of the four large volumes of testimony, much of which was heard orally before the Chancellor, a judgment was entered granting appellee an absolute divorce from appellant and giving her custody and control of the two children for ten months of the year from September through June. Appellant was given custody and control of the children for the months of July and August of each year and for the last week in the months of October, December, February, April and June of each year, with the usual right of visitation at all reasonable times and places by both parties. The judgment further provided that during the months in which appellee had custody of the children appellant was to pay her $50 per month for their support and maintenance and $50 per month for her own support. The judgment further awarded appellee a lump sum of $2500 as partial alimony and allowed her $600 for her attorney fees and taxed all costs against appellant. It is from this judgment that appellant prosecutes this appeal.

It is apparent from the 600 page record that has been brought before us on this appeal that this has been a most bitterly fought case, one of which the Chancellor says in his opinion filed in the case, "A more bitterly contested case has never been my lot to try." This view is concurred in by the attorneys in their briefs, in which briefs considerable slugging and personalities are engaged in between opposing counsel.

This appeal, of course, does not involve the question of the divorce since we have no jurisdiction to review the decision of the Chancellor on that part of the judgment. The only two questions involved are those parts of the judgment awarding custody of the children to appellee, and the amount of alimony and maintenance awarded appellee. The principal contention of appellant on this appeal is for the custody of the children and, while he contends that the alimony and maintenance

are excessive, he admits that no appeal would have been taken on that question had the custody question been decided in his favor. It would serve no useful purpose to review in detail the testimony which led the Chancellor to grant appellee the divorce. It will be necessary to consider to some extent that part relating to the questions involved on this appeal.

Appellant and appellee were married July 5, 1934. They lived at different times in two houses on the farm of appellant's father for a number of years, but later moved to Tompkinsville and lived with his mother and father in their town home for a time. Later appellee purchased from her father for $1000 a small home in Tompkinsville where they lived until appellee moved to Glasgow on July 19, 1947, and instituted this suit for divorce. During most of the time while living in Tompkinsville, appellee, in addition to her household duties, was employed outside her home, first at the National Stores in that town as a saleslady and later in a doctor's office as secretary. This doctor's office was located in the same building as the hotel in Tompkinsville and it was here that she seems to have met or come in contact with Thomas Haas who is the named corespondent in this case and with whom appellee is claimed to have had relations which resulted in appellant's charge against her of lewd and lascivious conduct. Haas, whose home was in Hoopston, Illinois, claims to have been a salesman of arms and ammunition although the inference from appellant's evidence and briefs is that he was engaged in some way in the illicit liquor trade. At any rate, he owned and operated a truck with his name and address on both cab doors, and spent a good deal of time around Tompkinsville. There are several small incidents brought out in appellant's proof tending to show familiarity between appellee and Haas, but it is largely on two major incidents that appellant relies to prove that her conduct with Haas was such as to sustain h's claim that she was guilty of such lewd and lascivious conduct as to justify denial of custody of the two children to her.

One of these was at Standing Stone State Park located over the line in Tennessee at which place it was sought to show that appellee and Thomas Haas were registered as Mr. and Mrs. Thomas Allen on or about

May 31, 1947. We have carefully examined all the testimony produced on both sides relating to this incident and we think under this evidence that appellant's charge in this conection is wholly unsustained and unproven and is based on mere suspicion.

The other incident occurred or was supposed to have occurred a few days after this suit had been filed, to wit, on the night of July 22, 1947. According to appellant's proof, on that night appellant noticed Thomas Haas and his truck were missing from his accustomed haunts in Tompkinsville. He surmised that this would mean that he and appellee would be found together somewhere. Accompanied by his friend, Fielding Ford, sheriff of Monroe County, he went to Cave City where he located the truck parked near the Dixie Hotel. This was after 1:00 a. m. and, upon looking at the hotel register, he found registered there the names of Mr. and Mrs. Thomas Allen. They then located Jesse Edmunds, a deputy sheriff of Barren County, and he returned with them to the vicinity of the Dixie Hotel, Edmunds in his separate car. They decided not to enter the room of Haas, but instead to set up a siege and watch the hotel for further developments. They maintained an all night vigil and at about 9:30 the morning of July 23, Thomas Haas emerged from the hotel with a young man who had apparently accompanied Haas to Cave City and registered at the same time, but occupied a different room. They obtained breakfast at a nearby restaurant, returned to the Haas truck and drove off together to the nearest filling station, but returned a few minutes later to its parking place near the hotel. About 10:00 o'clock a woman identified as appellee emerged from the Dixie Hotel, walked down to the Haas truck, got into the cab of the truck with Haas and the young man and proceeded to Glasgow followed by deputy sheriff Edmunds. At the edge of Glasgow the woman emerged from the truck, walked into town and into a five and ten cent store and Edmunds saw no more of her that day. Edmunds was not acquainted with and had never before seen appellee, but she had been described to him by his co-watchers, Ford and appellant, both of whom identified the woman who emerged from the Dixie Hotel on that morning as being the appellee and pointed her out to Edmunds. Appellant and Ford got sidetracked in the chase of the

truck from Cave City to Glasgow and did not go on to Glasgow as did Edmunds.

According to appellee's testimony, she was not at the Dixie Hotel in Cave City with Thomas Haas on the night of July 22, or any other night. In this, her testimony is confirmed by that of Thomas Haas who admits that he was registered at that hotel on that night under the name of Mr. and Mrs. Thomas Allen but that the woman with him was not Mrs. Richardson, appellee, but a woman whom he picked up at Glasgow in a restaurant and who told him her name was Ella Mae Woods and that she worked at Bowling Green. Appellee's testimony is further confirmed by that of Mrs. Howard Peden who lived in the apartment just below the apartment into which appellee had moved the day before, on the 21st of July. Mrs. Peden is positive that appellee spent the night with her in her downstairs apartment on the night of the 22nd and that they ate breakfast together at about 6 or 6:30 o'clock on the morning of the 23rd. This testimony is also confirmed by that of Mrs. Leroy Thompson who also occupied an apartment in the same four apartment building occupied by appellee and Mrs. Peden. She testified that appellee moved into one of these apartments on Monday, July 21, that she saw appellee go into Mrs. Peden's bedroom about 10 o'clock on the night of the 22nd and she assumed she spent the rest of the night there as appellee had breakfast with Mrs. Peden between 6 and 6:30 the next morning, the 23rd.

It will thus be seen that the proof on this vital point is in direct conflict and raises a serious doubt in our minds as to which is correct. It is hard to discredit the proof of appellant and Fielding Ford who, of course, knew appellee and were positive in their identification of her as the woman who emerged from the Dixie Hotel on the morning of July 23. Yet they were interested witnesses out to get damaging evidence against appellee for use in the pending divorce, Mr. Ford being paid by appellant for his work in this connection. Deputy sheriff Edmunds was more disinterested but, as stated by the Chancellor, he did not know appellee except by description and could have been mistaken. On the other hand, it could be expected that appellee faced with such a

serious charge while her divorce suit was pending would deny it and she would have no trouble in getting Haas to back her up in this denial if their relationship was such as was being charged against them. Likewise, it is difficult to discredit the testimony of the two women who testified that appellee spent that night with Mrs. Peden and ate breakfast with her early the next morning, the very morning when appellant says she was seen leaving the Dixie Hotel. Of course, both Mrs. Peden and Mrs. Thompson could have been mistaken as to the exact night appellee spent with Mrs. Peden and the morning she ate breakfast with her.

With our minds thus in doubt as to the real truth of the matter, we think great weight should be given to the decision of the Chancellor on this disputed question of fact. He apparently has given this case a great deal of consideration, as is evidenced by his carefully prepared opinion on file in the record. In that opinion he says most of the proof was heard orally before him and he thus had an opportunity not only to hear but to see most of the witnesses testifying and to note their demeanor while on the witness stand. This is a tremendous advantage which the Chancellor has over this court, the members of which must rely on the cold record before them. This is the principal reason why this court has often said that it will not override the Chancellor on close factual questions when from reading all the testimony we entertain only a doubt as to the correctness of his decision. We are further inclined to concur in the view expressed in the Chancellor's opinion that it is difficult to believe that this appellee, who appears to be a woman of some intelligence and business experience, would have taken such a chance as this escapade with which she is charged, at such a critical time in her affairs. She had filed suit on July 19, and a hearing was set for July 25 on the question of the custody of her children. It does not appear likely that any sensible person would have gone to a hotel ten miles away and spent the night with this man Haas, thus endangering her prospect of securing the custody of her children. It could have happened but, like the Chancellor, we are not convinced that it did. He resolved the doubt in her favor. We resolve our doubt in favor of the Chancellor's decision.

On the question of alimony and maintenance, there is not a great deal of proof. Appellant at present does not own any real estate although he is an heir apparent to one third of the five or six hundred acre farm in Monroe County. Technically he occupies the status of a tenant farmer on that farm receiving one half of the proceeds of the crops raised and the livestock sold off that farm by him. In addition to that he engages in the occupation of livestock trader from which he says he made about $1500 the previous year, but claims to be running behind for the current year. It is difficult to tell from the proof how much appellant makes from his farm operations but from the sales of livestock and crops, as brought out on cross-examination, appellee's attorney figures his gross income from this source at $6800 for the year 1947. When appellee filed her suit and ran an attachment against appellant, there was caught by that attachment his personal bank account of $502.64 and the sum of $2029.39 belonging to the father and son partnership of M. & H. Richardson, of which presumably one half belongs to appellant; also five shares of stock in the Farmers Commission Company with a par value of $100 per share and an automobile of the appraised value of $1500. Upon this showing we cannot say that the lump-sum alimony of $2500 nor the $100 per month for maintenance and alimony allowed by the Chancellor are excessive. The current alimony and maintenance are, of course, subject to change upon a showing of changed conditions.

The final contention of appellant is that the fee of $600 allowed appellee for her attorneys is excessive. It is true that some unnecessary proof was taken by attorneys for appellee but it has been a hard fought case and we do not think the fee allowed is excessive in view of the great amount of work involved.

On the whole case we are of the opinion that the judgment of the lower court should be and it is affirmed.

Judgment affirmed.